# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued April 19, 2005                    Decided July 29, 2005

No. 04-5009

NATIONAL ASSOCIATION OF HOME BUILDERS,
APPELLANT

v.

UNITED STATES ARMY CORPS OF ENGINEERS *ET AL.*,
APPELLEES

————

No. 04-5010

NATIONAL ASSOCIATION OF HOME BUILDERS,
APPELLANT

v.

UNITED STATES ARMY CORPS OF ENGINEERS *ET AL.*,
APPELLEES

————

No. 04-5011

NATIONAL ASSOCIATION OF HOME BUILDERS,
APPELLANT

v.

UNITED STATES ARMY CORPS OF ENGINEERS *ET AL.*,
APPELLEES

———

Appeals from the United States District Court
for the District of Columbia
(No. 00cv00379)
(No. 00cv00558)
(No. 00cv01404)

———

*Virginia S. Albrecht* argued the cause for the appellants.
*Karma B. Brown*, *Duane J. Desiderio*, *Felicia K. Watson*,
*Lawrence R. Liebesman*, *Rafe Petersen*, *Ethan Arenson, David
E. Frulla*, *Andrew D. Herman* and *Elizabeth A. Gaudio* were on
brief.

*Peter L. Gray*, *Robin S. Conrad*, *Richard S. Moskowitz*, *Alan
C. Raul* and *Brian T. Fitzpatrick* were on brief for *amici curiae*
Honorable Donald A. Manzullo *et al.* *Prasad Sharma* and
*Stephen A. Bokat* entered appearances.

*Greer S. Goldman*, Attorney, United States Department of
Justice, argued the cause for appellees United States Army Corp
of Engineers *et al.* *David C. Shilton*, *Martin McDermott* and
*Stephanie Tai*, Attorneys, United States Department of Justice,
were on brief.

*Howard I. Fox* was on brief for appellees, Natural Resources
Defense Council and Sierra Club.

*Eliot Spitzer*, Attorney General, State of New York, *Peter H. Lehner*, *Philip M. Bein* and *Tracy Hughes*, Assistant Attorneys General, State of New Mexico, were on brief for *amici curiae* States of New York and New Mexico.

Before: GINSBURG, *Chief Judge*, and HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The National Association of Home Builders (NAHB) and others[1] (collectively, the appellants) appeal the dismissal of their multi-pronged challenge to the issuance of certain permits by the United States Army Corps of Engineers (Corps) pursuant to section 404(e) of the Clean Water Act (CWA), 33 U.S.C. § 1344. The district court granted summary judgment to the Corps, concluding that it lacked subject matter jurisdiction to entertain any of the appellants' claims because the Corps' issuance of the permits did not constitute "final agency action" subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 704. *See Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 297 F. Supp. 2d 74 (D.D.C. 2003), *reprinted in* Joint Appendix (J.A.) at 146-52. We disagree; the appellants' claims, with one exception, are cognizable. Accordingly, we reverse the district court in part and remand for further proceedings consistent with this opinion.

## I.

The CWA aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33

---

[1] The other appellants are the National Stone, Sand and Gravel Association (NSSGA), the American Road and Transportation Builders Association (ARTBA), the Nationwide Public Projects Coalition (NPPC), the National Federation of Independent Businesses (NFIB) and Wayne Newnam, an Ohio homebuilder.

U.S.C. § 1251(a), by prohibiting the discharge of pollutants into navigable waters of the United States—except, that is, by permit, *see id.* § 1311(a).  The CWA divides the authority to issue permits to discharge pollutants between the United States Environmental Protection Agency and the United States Secretary of the Army, acting through the Corps, conferring on the latter the power to issue permits for discharges of "dredged or fill material" only.  *Id*. § 1344(a).  Responsibility for the day-to-day administration of the permitting regime falls to the Corps' district and division engineers.  *See* 33 C.F.R. § 320.1(a)(2).

The Corps issues a permit under section 404 of the CWA either on a class-wide ("general permit") or a case-by-case ("individual permit") basis.  33 U.S.C. § 1344(a), (e).  The Corps issues a general permit "on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material."  *Id.* § 1344(e)(1); *see also* 33 C.F.R. § 323.2(h).  Before issuing a general permit for a "category of activities," the Corps must "determine[] that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e)(1); *see also* 33 C.F.R. § 323.2(h)(1).  A general permit has a statutorily-limited lifespan—*i.e.*, no longer than five years—and may be revoked or modified if the authorized activities "have an adverse impact on the environment or . . . are more appropriately authorized by individual permits."  33 U.S.C. § 1344(e)(2).

The Corps' individual permit process is, by contrast, "a longer, more comprehensive procedure."  *New Hanover Township v. United States Army Corps of Eng'rs*, 992 F.2d 470, 471 (3d Cir. 1993).  The Corps makes a formal decision on an individual application following site-specific documentation and analysis, public interest review, public notice and comment and, if

necessary, a public hearing. *See* 33 C.F.R. § 320.4; *id.* §§ 323, 325; *see also Home Builders Ass'n of Greater Chicago v. United States Army Corps of Eng'rs*, 335 F.3d 607, 612 (7th Cir. 2003). If the Corps initially denies an individual application, the applicant may challenge that determination through an administrative appeals process. *See* 33 C.F.R. § 331. Indeed, a disappointed applicant must exhaust his administrative remedies before heading to federal court. *See id.* § 331.12.

Thus a party desiring to discharge fill or dredged material into our nation's navigable waters may do so in either of two ways. *See New Hanover Township*, 992 F.2d at 471. If the proposed discharge activity is covered by a general permit, the party may proceed without obtaining an individual permit or, in some cases, even without giving the Corps notice of the discharge. *See* 33 C.F.R. § 330.1(e)(1) ("In most cases, permittees may proceed with activities authorized by [nationwide general permits] without notifying the [district engineer]."); *New Hanover Township*, 992 F.2d at 471 (discharger may "simply operate under the [general] permit without informing the Corps in advance unless the [general] permit in question requires advance approval from the Corps"). On the other hand, if the proposed discharge is not covered by a general permit, the party must secure an individual permit before undertaking the discharge. *See* 33 C.F.R. § 323.3(a). A party that discharges without meeting the conditions of a general permit or obtaining an individual permit faces both civil and criminal enforcement actions. *See* 33 U.S.C. § 1319; 33 C.F.R. § 326.5-.6.

This litigation involves several nationwide permits, or NWPs, a species of general permit designed to minimize delays and paperwork for projects with minimal environmental impact. *See* 33 C.F.R. § 330.1(b). The Corps has issued this kind of permit for five-year intervals since 1977, *see Nat'l Ass'n of Home Builders*, 297 F. Supp. 2d at 77; *Public Notice Concerning Changes to Nationwide Permit 26*, 63 Fed. Reg. 39,276, 39,277

(July 22, 1998), including the once widely-used but now defunct NWP 26, *see Final Notice of Issuance, Reissuance, and Modification of Nationwide Permits*, 61 Fed. Reg. 65,874, 65,892 (Dec. 13, 1996) (noting 13,837 activities were authorized by NWP 26 in 1995 alone). There are currently 43 NWPs in force—covering activities ranging from "Single-family Housing" (NWP 29) to "Mining Activities" (NWP 44) to "Cranberry Production Activities" (NWP 34)—that are subject to 27 General Conditions (GCs)[2]—regarding matters like "Soil Erosion and Sediment Controls" (GC 3) and "Notification" (GC 13). *See Issuance of Nationwide Permits; Notice*, 67 Fed. Reg. 2020, 2077, 2078-94 (Jan. 15, 2002). In their current version, the assorted NWPs, applicable conditions and relevant definitions span nearly 20 pages in the Federal Register. *See id.* at 2077-94.

In 1996, the Corps proposed to reissue a number of existing NWPs, albeit with modifications, that were otherwise set to expire on January 21, 1997. *See Proposal to Issue, Reissue, and Modify Nationwide Permits; Public Hearing*, 61 Fed. Reg. 30,780 (June 17, 1996). As to NWP 26, which, at the time, authorized a party to discharge dredged or fill materials affecting up to ten acres of water into headlands and isolated wetlands without an individual permit and required only notice to a Corps district engineer of any discharge causing loss or substantial adverse modification of one to ten acres of wetlands, the Corps gave public notice of—and sought comment on—proposed changes to its "pre-construction notification" timeline and acreage threshold limits. *See id.* at 30,783. It also notified the public that it planned to "initiate a process to regionalize" NWP 26 to "further improve its effectiveness." *Id.*

---

[2] The Corps' GCs "must be followed in order for any authorization by an NWP to be valid." *Issuance of Nationwide Permits; Notice*, 67 Fed. Reg. 2020, 2089 (Jan. 15, 2002).

Following public comment, the Corps decided to replace NWP 26 with "activity-specific" general permits. *See Final Notice of Issuance, Reissuance, and Modification of Nationwide Permits*, 61 Fed. Reg. 65,874, 65,875 (Dec. 13, 1996). To allow ample time to develop replacement permits, however, it reissued NWP 26 for a two-year period but with more stringent conditions. *See id.* at 65,877, 65,891, 65,895. In July 1998, the Corps published a proposed suite of activity-specific general permits to replace NWP 26, *see Proposal to Issue and Modify Nationwide Permits*, 63 Fed Reg. 36,040 (July 1, 1998), and extended, once more, the life of NWP 26 until December 30, 1999 "or the effective date of the new and modified NWPs, whichever comes first," *Proposal to Issue and Modify Nationwide Permits; Notice*, 64 Fed. Reg. 39,252, 39,260 (July 21, 1999). That same month the Corps also reissued the NWP regarding single-family housing (NWP 29), but reduced the authorized maximum acreage impact from one-half to one-quarter acre. *See Final Notice of Modification of Nationwide Permit 29 for Single Family Housing*, 64 Fed. Reg. 47,175 (Aug. 30, 1999).

The Corps issued a second proposed set of activity-specific NWPs to replace NWP 26 one year later. *See* 64 Fed. Reg. at 39,252. In March 2000, following another round of public comment, the Corps promulgated activity-specific permits consisting of five new NWPs and six modified NWPs, all intended to replace NWP 26. *See Final Notice of Issuance and Modification of Nationwide Permits*, 65 Fed. Reg. 12,818 (Mar. 9, 2000). With some of the activity-specific NWPs, the Corps reduced the authorized maximum per-project acreage impact from ten acres to one-half acre and required preconstruction notification for impacts greater than one-tenth acre. *See* 65 Fed. Reg. at 12,818. Although December 30, 1999 preceded the effective date of the replacement permits, the Corps nevertheless decided to have NWP 26 expire the same day the new permits took effect—June 7, 2000. *Compare* 65 Fed. Reg.

at 12,818 (extending NWP 26's expiration date to June 5, 2000), *with Final Notice of Issuance and Modification of Nationwide Permits*, 65 Fed. Reg. 14,255 (Mar. 16, 2000) (making June 7, 2000 "the correct effective date for the new and modified NWPs, as well as the correct expiration date for NWP 26.").

The Corps' new permits prompted three law suits the district court eventually consolidated into one. The NAHB's suit was filed on February 28, 2000, followed by the NSSGA's suit on March 16, 2000, and the NFIB's suit on June 14, 2000. Together, the three suits allege four claims against the Corps, to wit: (1) it exceeded its statutory authority under the CWA by imposing certain permit conditions; (2) it acted arbitrarily and capriciously, in violation of the APA, 5 U.S.C. § 706(2)(A), by failing to provide a rational basis for its permit acreage thresholds; (3) it violated the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601 *et seq.*, by failing to evaluate the potential impact of the permits on small businesses and other small entities as well as alternatives to the permits; and (4) it violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4231 *et seq.*, by failing to prepare a Programmatic Environmental Impact Statement (PEIS) for the permits. The National Resources Defense Council and the Sierra Club (the intervenors) intervened in the district court proceedings in support of the Corps.

The appellants moved for summary judgment on February 15, 2001. The Corps and intervenors responded with motions for summary judgment of their own on June 14, 2001. While the parties' cross-motions for summary judgment lay pending, on January 15, 2002, the Corps reissued all 43 NWPs, including the eleven March 2000 NWPs it issued to replace NWP 26, to make their expiration dates coincide, thereby "reduce[ing] confusion regarding the expiration of the NWPs and the

administrative burden of reissuing NWPs at different times."[3] *See* 67 Fed. Reg. at 2020. In November 2003, the district court granted summary judgment to the Corps, concluding that "the Corps' issuance of the new NWPs and general conditions, while constituting the completion of a decisionmaking process, does not constitute a 'final' agency action because no legally binding action has taken place as to any given project until either an individual permit application is denied or an enforcement action is instituted." *Nat'l Ass'n of Home Builders*, 297 F. Supp. 2d at 78. Calling the "general permit program . . . the first step of a larger permitting process that enables the agency to streamline the overall process by limiting the pool of applicants at the front-end of the process," the district court concluded that a party not eliminated from the applicant pool must "simply apply for an individual permit" and, consequently, "is not legally denied anything until [his] individual permit is rejected." *Id.* at 80.

The appellants now appeal the district court's judgment, which we review *de novo. See, e.g., Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1278 (D.C. Cir. 2004).

## II.

The jurisdictional infirmity the lower court found fatal to this case was the want of a final agency action subject to judicial review; that is only one of the issues, however, joined by the parties and requiring our resolution. First, we consider whether the Corps took "final agency action" subject to challenge under the APA and, if so, whether the appellants' challenge is otherwise ripe for judicial review. Next, we address whether

---

[3] Some of the NWPs expired on February 11, 2002, while others expired on March 11, 2002. *See* 67 Fed. Reg. at 2020. As the Corps reissued all of the NWPs, GCs and applicable definitions on March 18, 2002, they expire five years from that date. *See id.*; *see also* 33 U.S.C. § 1344(e)(2) (general permits limited to five-year lifespan).

the appellants may challenge the Corps' compliance with the RFA and, again, whether that challenge is ripe. Finally, we review the appellants' standing *vel non* to challenge the Corps' compliance with NEPA.

**A.**

Where, as here, no more specific statute provides for judicial review, the APA empowers a federal court to review a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Home Builders Ass'n of Greater Chicago*, 335 F.3d at 614. "[T]wo conditions," the United States Supreme Court tells us, "must be satisfied for agency action to be 'final.' " *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78 (internal quotation marks & citations omitted). In other words, an agency action is final if, as the Supreme Court has said, it is " 'definitive' " and has a " 'direct and immediate . . . effect on the day-to-day business' " of the party challenging it, *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980) (quoting & citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)); *see also Reliable Automatic Sprinkler Co. v. Consumer Prods. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003), or if, as our court has said, "it imposes an obligation, denies a right or fixes some legal relationship." *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731 (citing *Role Models Am., Inc. v. White*, 317 F.3d 327, 331-32 (D.C. Cir. 2003)). There can be little doubt that under these standards the Corps' issuance of the

NWPs challenged by the appellants constitutes final agency action subject to judicial review.[4]

We need not tarry long on the finality test's first prong; plainly, the Corps' issuance of the revised NWPs "mark[s] the consummation of [its] decisionmaking process." *Bennett*, 520 U.S. at 178. There is nothing "tentative" or "interlocutory" about the issuance of permits allowing any party who meets certain conditions to discharge fill and dredged material into navigable waters. The intervenors argue, however, that, by "setting terms and conditions for NWPs, the Corps did not finally decide that a would-be discharger must comply with those terms and conditions, nor did the Corps finally deny authorization for discharges that exceed those terms and conditions." Intervenors' Br. at 15. In their view, "[a] would-be discharger remains free to pursue an individual or general permit that is free of those restrictions." Intervenors' Br. at 15. The district court similarly opined that a party whose activities do not meet the conditions set by the NWPs has not been "denied anything until [he] has exhausted all of [his] permit options." *Nat'l Ass'n of Home Builders*, 297 F. Supp. 2d at 80. This is so, said the district court, because "the general permit program, in effect, is the first step of a larger permitting process that enables the agency to streamline the overall process by limiting the pool of applicants at the front-end of the process." *Id.* If the issuance of the NWPs had merely altered the procedural framework for obtaining the Corps' permission to discharge fill or dredged material into navigable waters, the district court's reasoning—now advanced by the intervenors—might be sound. A requirement that a party participate in additional administrative proceedings "is different in kind and legal effect from the burdens attending what

---

[4] Only the intervenors make a "finality" challenge. The Corps does not challenge the finality of its issuance of the NWPs but instead questions the ripeness of the claim. *See* opinion *infra* at 15.

heretofore has been considered to be final agency action." *Standard Oil Co.*, 449 U.S. at 242. We have in fact noted that "the doctrine of finality" would be no more than "an empty box" if the mere denial of a procedural advantage constituted final agency action subject to judicial review. *ALCOA v. United States*, 790 F.2d 938, 942 (D.C. Cir. 1986).

But the NWPs do not simply work a change in the Corps' permitting procedures, thereby disadvantaging some within the class of would-be dischargers. The NWPs are not a definitive, but otherwise idle, statement of agency policy—they carry easily-identifiable legal consequences for the appellants and other would-be dischargers. Admittedly, our precedent announces no self-implementing, bright-line rule in this regard; the finality inquiry is a "pragmatic" and "flexible" one. *See, e.g., Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435-36 (D.C. Cir. 1986) ("[W]e are to apply the finality requirement in a 'flexible' and 'pragmatic' way." (quoting & citing *Abbott Labs.*, 387 U.S. at 149-50)). Nevertheless, if an EPA directive forbidding the use of third-party human test data to evaluate pesticides' effects constituted final agency action subject to judicial review before the EPA invoked it against any pesticide applicant, *see CropLife Am. v. EPA*, 329 F.3d 876, 881-83 (D.C. Cir. 2003), and a Federal Communications Commission decision putting the burden on telephone companies to show their entitlement to certain costs was suitable for judicial review before any telephone company was denied costs, *see Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1041 (D.C. Cir. 1991), the Corps' issuance of NWPs likewise satisfies the second prong of the finality test. To our mind, all three constitute challenges to agency action "with legal consequences that are binding on both petitioners and the agency." *CropLife Am.*, 329 F.3d at 882; *see also Mountain States Tel. & Tel. Co.*, 939 F.2d at 1041.

The Corps' NWPs create legal rights and impose binding obligations insofar as they authorize certain discharges of dredged and fill material into navigable waters without any detailed, project-specific review by the Corps' engineers. *See, e.g.*, 65 Fed. Reg. at 12,818 ("The terms and limits of the new and modified NWPs are intended to authorize activities that have minimal adverse effects on the aquatic environment, individually and cumulatively."). The "direct and immediate" consequence of these authorizations for the appellants' "day-to-day business" is not hard to understand: While some builders can discharge immediately, others cannot. If the appellants' planned activities do not meet the applicable NWP's conditions and thresholds, they have two options. They can either put their projects on hold and run the Corps' individual-permit gauntlet or modify the projects to meet the conditions. Either way, through increased delay or project modification, the NWPs directly affect the investment and project development choices of those whose activities are subject to the CWA. Indeed, the Corps itself appreciated that its permits would influence project design. "Many project proponents," it noted, "will design their projects to comply with the 1/2 acre limit so that they can qualify for an NWP and receive authorization more quickly than they could through the standard permit process." 65 Fed. Reg. at 12,821. We would be hard pressed, and in fact decline, to conclude that the NWPs do not "impose[] an obligation, den[y] a right or fix[] some legal relationship." *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731.

In addition, the intervenors argue that environmental groups, such as themselves, may challenge the Corps' issuance of NWPs as final agency action but the appellants may not. This is so, they say, because an environmental group would challenge the discharges authorized by the Corps—that is, it would *oppose* an agency action—while the appellants challenge the Corps' failure to authorize certain discharges—that is, they seek to *compel* agency action. The appellants seek to compel

agency action in this instance, the intervenors maintain, because "the Corps did not finally decide that a would-be discharger must comply with [the NWP] terms and conditions, nor did the Corps finally deny authorization for discharges that exceed those terms and conditions." Intervenors' Br. at 15. Thus "would-be dischargers" such as the appellants "remain free to pursue an individual or general permit." Intervenors' Br. at 15. It is true that a party seeking to challenge an agency's *failure to act* faces a different burden from that borne by a challenger of agency *action*. An action to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), is similar to a petition for mandamus and we apply a six-factor standard to determine if "the agency has a duty to act and [if] it has 'unreasonably delayed' in discharging that duty." *In re Am. Rivers*, 372 F.3d 413, 418 (D.C. Cir. 2004); *see also Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984). A challenge to agency action, by contrast, is simply resolved according to the APA. But the case on which the intervenors principally ground their argument—*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 124 S. Ct. 2373 (2004)—tends only to demonstrate why the oppose action/compel action dichotomy does not make the Corps' action non-final as to the appellants. In *S. Utah Wilderness Alliance*, various environmental groups challenged the Bureau of Land Management's failure to protect public lands from damage allegedly caused by off-road vehicles. *See id.* at 2377-78. At the outset, the Supreme Court noted that "[f]ailures to act are sometimes remediable under the APA, but not always," and ultimately held that the BLM's failure was not reviewable because "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," *id.* at 2379 (emphases in *S. Utah Wilderness Alliance*), and the BLM did not fail to take "required" action, *id.* at 2380, 2384. Here the appellants challenge not the Corps' failure to act—*i.e.*, "the omission of an

action without formally rejecting a request," *id.* at 2379—as unreasonable under APA section 706(1); instead, they attack the NWPs the Corps *did* issue as arbitrary and capricious and beyond its permitting authority under APA section 706(2)(A). Because the Corps' NWPs mark the completion of the Corps' decision-making process and affect the appellants' day-to-day operations, they constitute final agency action regardless of the fact that the Corps' action might carry different (or no) consequences for a different challenger, such as an environmental group. In any event, the notion that "would-be dischargers" like the appellants nevertheless "remain free to pursue an individual or general permit" suggests a ripeness—not a finality—problem. *See Office of Communication of United Church of Christ v. FCC*, 911 F.2d 813, 816-17 (D.C. Cir. 1990) (FCC's refusal to adopt anti-trafficking policy and presumption that broadcast license transfer in less than three years is contrary to public interest are matters ripe for review). We turn to that issue now.

## B.

Both the Corps and the intervenors, recognizing that we may affirm the district court on an alternative ground, *see, e.g., Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1150 (D.C. Cir. 1984) ("In this appeal, appellee has sought to justify the judgment below upon a ground argued below but not relied upon by the opinion of the district court. We may of course sustain on such a ground.") (citing *Langnes v. Green*, 282 U.S. 531, 538-39 (1931)), maintain that the appellants' challenge is not ripe for judicial review. Not so.

The doctrine of ripeness shares with its statutory counterpart, *viz.*, finality, "the dual concerns of prematurity of judicial intervention in agency processes and the proper and principled exercise of judicial power." *USAA Fed. Sav. Bank v. McLaughlin*, 849 F.2d 1505, 1508 (D.C. Cir. 1988). That is, "its basic rationale," the Supreme Court tells us, "is to prevent

the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148-49. The ripeness doctrine has two components: "[It] requires us to consider 'the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration.' " *Village of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (quoting & citing *Abbott Labs.*, 387 U.S. at 149). Neither of these considerations—which we address in turn—counsels in favor of postponement here.

The appellants' challenge easily satisfies the first ripeness prong—fitness. "[T]he fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.' " *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (quoting & citing *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998)). The appellants' APA challenge is "purely legal," *Atl. States Legal Found.*, 325 F.3d at 284: They allege that the Corps exceeded its statutory authority in drafting the NWPs and that the Corps failed to offer a reasoned basis for their conditions and restrictions. *See* J.A. 8-9, 27, 44-51, 73-78; Appellants' Br. at 14-16. We have repeatedly held that "[c]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues." *See, e.g.*, *Atl. States Legal Found.*, 325 F.3d at 284 (citing *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir. 2002)). We have also often observed that a purely legal claim in the context of a facial challenge, such as the appellants' claim, is "presumptively reviewable." *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003); *see also Mountain States Tel. & Tel. Co.*, 939 F.2d at 1041 ("In

light of the wholly legal and facial nature of the present challenge, we cannot agree that our ability to review the agency's decision would be increased by delay.").

While we have cautioned that sometimes "even purely legal issues may be unfit for review," *Atl. States Legal Found.*, 325 F.3d at 284, we cannot accept the Corps' argument that the appellants' purely legal challenge is unfit for review at this time. It initially argues that the NWPs are not fit for review because their applicability to a given activity remains within the Corps' discretion. We have already debunked this theory. In *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000), we explained that "the fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Id.* In addressing the ripeness of an EPA Guidance, we recently explained that "if the possibility . . . of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of law." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002). That the Corps retains some measure of discretion with respect to the NWPs does not make the appellants' purely legal challenge unripe.

The Corps and the intervenors further argue that the appellants' APA challenge remains "hopelessly abstract" until "a member submits an actual individual permit application proposing a specific project, has its application denied or unlawfully conditioned, and completes the administrative appeal process provided by Corps regulations." Appellees' Br. at 24; *see also* Intervenors' Br. at 20-23. While it is undoubtedly true that a "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed not occur at all," we see no reason here to "wait for a rule to be applied to see what its effect will be." *Atl. States Legal Found.*, 325 F.3d at 284 (internal quotation

marks & alteration omitted). No further factual development is necessary to evaluate the appellants' challenge. All of the facts necessary for judicial review were before the Corps when it issued the permits and, on APA review, its action necessarily stands or falls on that administrative record and its statutory permitting authority under the CWA. *See Fox Television Stations*, 280 F.3d at 1039 (issue fit for judicial review because whether agency action is arbitrary and capricious or contrary to law is "purely legal" question); *cf. Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004) (claim fit for review "as it can be wholly resolved by an analysis of the Sunshine Act, the Act's legislative history, and its construction by relevant case law").

Relying on *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), the intervenors also argue that the appellants' challenge is not ripe because the CWA does not explicitly provide for facial review of a NWP and because the appellants need not adjust their conduct immediately. In *Lujan*, the Supreme Court rejected the National Wildlife Federation's attempt to challenge the "continuing (and thus constantly changing) operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." *Id*. at 890. The Court explained:

> [R]espondent cannot seek *wholesale* improvement of this program by court decree . . . . Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm. Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a

regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (*The major exception, of course, is a substantive rule which as a practical matter requires the appellant to adjust his conduct immediately. Such agency action is "ripe" for review at once, whether or not explicit statutory review apart from the APA is provided.*)

*Id*. at 891 (internal citations omitted; second emphasis added). But the appellants, unlike the National Wildlife Federation in *Lujan*, do not seek "wholesale" revision of the Corps' permitting framework. Rather, they challenge a specific agency action—*i.e.*, the Corps' issuance of NWPs authorizing certain discharges of dredged and fill material—that requires them to adjust their conduct immediately, as discussed above. And "[s]uch agency action," the Court observed in *Lujan*, "is 'ripe' for review at once, whether or not explicit statutory review apart from the APA is provided." *Id.* Accordingly, "[i]n light of the wholly legal and facial nature of the present challenge," the appellants' APA claim is fit for judicial review now. *Mountain States Tel. & Tel. Co.*, 939 F.2d at 1041.

Turning to the hardship prong of the ripeness test, we conclude that this requirement is also satisfied. Any institutional interest in postponing review must be balanced against the resultant hardship to the appellants in order to determine whether immediate review is proper. *See Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990) ("If we have doubts about the fitness of the issue for judicial

resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay."). On the one hand, no institutional interest of the court supports postponement. *See Mountain States Tel. & Tel. Co.*, 939 F.2d at 1041. The administrative process has run its course, resulting in general permits and conditions that the appellants have challenged as arbitrary, capricious and contrary to law under the APA. Their success depends on the administrative record and the statutory parameters of the Corps' permitting authority under the CWA. On the other hand, we cannot agree with the Corps that the appellants face no hardship as a result of postponed judicial review because, as it would have us believe, legal consequences flow only from "a collective permitting decision on a specific project" and consequently any alleged harm is purely "hypothetical at this time." Appellees' Br. at 28. Nor do we agree with the intervenors' similar suggestion that any alleged harm is ameliorated by the appellants' ability to "pursue further agency remedies." Intervenors' Br. at 23. To the contrary, the fact of the matter is that in the absence of judicial review the appellants are left with the choices we identified earlier: They must either modify their projects to conform to the NWP thresholds and conditions (as the Corps contemplates they will do) or refrain from building until they can secure individual permits. The NWPs therefore affect the appellants' activities in a "direct and immediate" way. *See Elec. Power Supply Ass'n*, 391 F.3d at 1263 (hardship demonstrated where "implementation of the market monitor exemption will have a direct and immediate impact on the appellant that rises to the level of hardship." (internal quotation marks & alteration & citations omitted)); *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986) (DOJ guidelines caused hardship where " 'direct and immediate impact' " on appellants' "primary conduct" would be "felt immediately" (citing & quoting *Abbott Labs.,* 387 U.S. at 152; *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967))); *cf. Texas v.*

*United States*, 523 U.S. 296, 301 (1998) (no hardship where party "not required to engage in, or to refrain from, any conduct"); *Pfizer Inc. v. Shalala*, 182 F.3d 975, 979 (D.C. Cir. 1999). Accordingly, we hold that the appellants' APA challenge is ripe for judicial review.

## C.

For "any rule subject" to the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610." 5 U.S.C. § 611(a)(1). The Corps and the intervenors have an argument apiece as to why the appellants cannot challenge the Corps' compliance with the RFA under this provision. We reject both and hold instead that the appellants' RFA claim, like their APA claim, is justiciable.

The NWPs, the Corps says, do not constitute a "rule" subject to review under section 604 of the RFA for two reasons, both of which hinge on the RFA's definition of a rule as "any rule for which the agency publishes a general notice of proposed rulemaking pursuant to section 553(b) of [the APA], or any other law." 5 U.S.C. § 601(2). The Corps initially contends that the NWPs fall within the APA's definition of "adjudication"—defined as an "agency process for the formulation of an order," *id.* § 551(7)—rather than "rule," which is defined as 'the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). Each NWP constitutes an "adjudication," so the Corps' argument goes, because it fits the APA's definition of adjudication as the formulation of an "order," *id.* § 551(7), an "order" includes a "licensing" disposition, *id.* § 551(6), and a "license" includes a "permit," *id.* § 551(8). We reject this elaborate statutory construction for the more straightforward one.

Each NWP easily fits within the APA's definition of "rule." This is so because each NWP, which authorizes a permittee to discharge dredged and fill material (and thereby does not allow others without an individual permit), is a legal prescription of general and prospective applicability which the Corps has issued to implement the permitting authority the Congress entrusted to it in section 404 of the CWA. *See* 33 U.S.C. § 1344(e). As such, each NWP constitutes a rule: An "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4); *see generally Hercules, Inc. v. EPA*, 598 F.2d 91, 117 (D.C. Cir. 1978). It is of course the Corps' decision whether to proceed by rule or adjudication, *see SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947), but "rules is rules," no matter their gloss. *See Granholm ex rel. Mich. Dep't of Natural Res. v. FERC*, 180 F.3d 278, 282 (D.C. Cir. 1999) (quoting & citing BARTLETT J. WHITTING, MODERN PROVERBS AND PROVERBIAL SAYINGS 541 (1989)).

Relying again on section 601(2) of the RFA, the Corps asserts that the NWPs are not rules because it did not issue any notice of proposed rulemaking pursuant to APA's rulemaking provision, 5 U.S.C. § 553, or publish them in the Code of Federal Regulations. We have explained that an agency must comply with the "procedures laid down" in the APA only when it promulgates "legislative rules." *Appalachian Power Co.*, 208 F.3d at 1020. "Legislative rules," we have said, "are those that grant rights, impose obligations, or produce other significant effects on private interests." *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980).

Despite our declarations that "[o]nly 'legislative rules' have the force and effect of law" and '[a] 'legislative rule' is one the agency has duly promulgated in compliance with the procedures laid down in the statute or in the Administrative Procedure Act," *Appalachian Power Co.*, 208 F.3d at 1020, we have not

hesitated to consider an agency pronouncement issued without meeting required APA procedures a rule. *See id.* at 1020 n.11 ("We have also used 'legislative rule' to refer to rules the agency should have, but did not, promulgate through notice and comment rulemaking." (citing *Am. Mining Cong. v. Dep't of Labor*, 995 F.2d 1106, 1110 (D.C. Cir. 1993)). While an "agency's characterization of an official statement as binding or nonbinding has been given some weight, *of far greater importance is the language used in the statement itself.*" *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537-38 (D.C. Cir. 1986) (citation omitted; emphasis added). As we said in *Appalachian Power Co.*:

> If an agency . . . treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

208 F.3d at 1021. The NWPs authorize certain discharges of dredged and fill material and in so doing "grant rights, impose obligations, [and] produce other significant effects on private interests." *Batterton,* 648 F.2d at 701-02; *see also Appalachian Power Co.*, 208 F.3d at 1021.

The intervenors, for their part, contend that "even if an NWP could be considered a 'rule' within the meaning of the RFA, [the appellants'] claims here do not challenge final agency action, . . . and thus are not cognizable under the RFA's judicial review provision." Intervenors' Br. at 28 (citing 5 U.S.C. § 611(a)(3)(A)). We have already explained at length that, as the Corps' NWPs represent its final word, there can be little

doubt that the appellants *do* challenge a final agency action. Accordingly, we hold that the appellants are entitled to press their RFA challenge now as the Corps' issuance of the NWPs constitutes final agency action in the form of a legislative rule and their challenge focuses on the Corps' compliance with sections 604 and 605 of the RFA. *See* J.A. 27-28.

Although both the Corps and the intervenors appear not to question the ripeness of the appellants' RFA claim, we briefly explain why we think the RFA claim is ripe. The Supreme Court has admonished that " 'procedural rights' are special," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992), and that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998). The RFA, similar to NEPA in the environmental sphere, requires an agency to evaluate the adverse economic effects of and less harmful alternatives to its actions before taking them. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997) ("[A] useful parallel can be drawn between RFA § 604 and the National Environmental Policy Act, which furthers a similar objective . . . ."). Thus, as with a NEPA challenge, the appellants may complain of the Corps' alleged failure to comply with the procedures set forth in sections 604 and 605 of the RFA at the time the alleged failure occurred, *i.e.*, when the Corps issued the NWPs without complying with those procedures. In sum, the appellants' RFA challenge "can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737.

**D.**

Finally, we address the Corps' assertion that the appellants lack prudential standing to maintain their NEPA challenge.[5] Three propositions bearing on federal court jurisdiction are by now obvious: Want of jurisdiction robs a federal court of the power to act, *see, e.g., B & J Oil & Gas v. FERC,* 353 F.3d 71, 74-75 (D.C. Cir. 2004), standing is a prerequisite to jurisdiction, *see, e.g., Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912, 915-16 (D.C. Cir. 2003), and the appellants bear the burden of establishing their standing to sue, *see, e.g., KERM, Inc. v. FCC*, 353 F.3d 57, 59 (D.C. Cir. 2004). A fourth is now equally manifest in our Circuit. When a complainant's standing is not "self-evident," he must "supplement the record to the extent necessary to explain and substantiate [his] entitlement to judicial review." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). That is, in *Sierra Club*, we put on notice all complainants whose standing is unclear that they must prove their standing by a "substantial probability," *id.* at 899, and that they should do so "by the submission of [their] arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding," *id.* at 900. Our *Sierra Club* rule is rooted in notions of fairness and judicial economy not difficult to grasp: As the complainant is ordinarily in possession of the facts on which he relies for standing, making those facts manifest at the outset saves the parties and the court from squandering time and energy, either by "flail[ing] at the unknown in an attempt to prove the negative" or by needlessly wrangling over an uncontested point. *Id.* at 901.

---

[5] Although the district court did not make explicit the basis for dismissing the NEPA claim, presumably it did so for the same reason it dismissed the RFA claim, *i.e.*, no final agency action. *See Nat'l Ass'n of Home Builders*, 297 F. Supp. 2d at 78 n.5.

We think that it is fairly "self-evident" that the various appellants as representatives of the regulated parties satisfy the "irreducible constitutional minimum" of Article III standing, *Lujan*, 504 U.S. at 560 (injury-in-fact, causation, redressability) and the additional requirements for representational standing, *see Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977) (one member with standing to sue in his own right, association seeks to protect interests germane to its purpose, no individual member need participate in lawsuit). But as the Supreme Court has explained, constitutional standing is not the end of the game because the "question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' " *Bennett*, 520 U.S. at 162 (quoting & citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Prudential standing requires "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision." *Bennett*, 520 U.S. at 162; *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004). The zone-of-interest test, however, is intended to "exclude only those whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). And it is by no means self-evident to us that the appellants have prudential standing to advance their NEPA challenge.

The Corps and the intervenors agree with our conclusion but for reasons with which we do not agree. The Corps offers that the appellants do not fall within NEPA's zone-of-interest because their claims are more likely to frustrate than effectuate NEPA's purposes, their asserted injury is "purely economic" and their interest is merely "in avoiding 'unnecessary delays, regulatory uncertainty, and considerable cost to [their] members.' " Appellees' Br. at 35-36 (quoting NSSGA's complaint; alteration in Appellees' Br.). The intervenors

similarly assert that the appellants do not constitute "an appropriate representative of the environmental interests underlying the statute." Intervenors' Br. at 28 n.14. The premise underlying this reasoning is flawed—commercial entities are not *per se* excluded from NEPA's zone-of-interest.

"[A]n allegation of injury to monetary interest alone may not," of course, "bring a party within the zone of environmental interests as contemplated by NEPA for purposes of standing." *Realty Income Trust v. Eckerd*, 564 F.2d 447, 452 (D.C. Cir. 1977). But we have often observed that "a party is not precluded from asserting cognizable injury to environmental values because his 'real' or 'obvious' interest may be viewed as monetary" or " 'disqualified' from asserting a legal claim under NEPA because the 'impetus' behind the NEPA claim may be economic." *Id.*; *see also Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996). "[P]arties motivated by purely commercial interests routinely satisfy the zone of interests test," we have said, as "[c]ongruence of interests, rather than identity of interests, is the benchmark." *Amgen, Inc. v. Smith,* 357 F.3d 103, 109 (D.C. Cir. 2004). We have even observed that "it surely does not square with the broad Congressional purpose in NEPA of assuring that environmental values would be adequately and pervasively considered in federal decision-making for private parties who may not be 'pure of heart' to be excluded from vindicating the Act." *Realty Income Trust*, 564 F.2d at 453.

Thus the appellants' problem is not that their "economic interests . . . blight [their] qualifying ones," *Mountain States Legal Found.*, 92 F.3d at 1236; rather, they have failed to demonstrate by a "substantial probability" that they have any qualifying ones, *Sierra Club*, 292 F.3d at 899. Prudential standing need only be shown by one appellant and, as only the NPPC presses the NEPA challenge, it is no surprise that the appellants rely solely on NPPC's averments in their effort to

demonstrate prudential standing. *See Mountain States Legal Found.*, 92 F.3d at 1232 (Because "prudential standing can be shown for at least one appellant," court need "not consider the standing of the other appellants to raise th[is] claim." (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977))). The NPPC's membership is principally composed of local government agencies that "are involved in municipal, industrial and agricultural water supply, flood control, irrigation, wastewater and stormwater management, street and highway construction and maintenance, and environmental quality amenities." J.A. 125. To support its contention that it falls within NEPA's zone-of-interest to challenge the NWPs, it relies on the averments of its Executive Director, Robert Tonsing, in paragraph eight of his affidavit:

> [D]ue to the inflexible one-half acre rule, the incentive for NPPC members to narrowly tailor their projects so as to fit under the "minimal effects" acreage cap has been significantly reduced. In many cases, under the three-acre rule previously enforced by the Corps, members would scale back their projects in order to satisfy the "minimal effect" standard. But with the one-half acre rule, it is virtually impossible for NPPC members to do so because very few projects can fit within the one-half acre cap. Thus, the imagined environmental benefit to be achieved by the Corps' inflexible one-half acre rule is unlikely to be realized.

J.A. 128. In their brief, the appellants characterize this paragraph as supporting the proposition that "[t]he restrictions in the [permits] and the delays in processing times mean that NPPC members cannot provide [their] important public services in a timely manner, increasing flood risk for the communities

that NPPC members serve, posing a significant threat to people and property." Appellants' Br. at 13 (citing J.A. 128, ¶ 8).

NPPC's theory of prudential standing, so far as we can tell, is rooted in the contention that the Corps' failure to issue more lenient NWPs prevents NPPC from improving the environment. We need not conclude that NPPC's theory fails to "square with the broad Congressional purpose in NEPA of assuring that environmental values would be adequately and pervasively considered in federal decision-making." *Realty Income Trust*, 564 F.2d at 453. Even if we accept that it may be possible for NPPC's members to suffer a procedural injury sufficient to bring them within NEPA's zone-of-interest, nowhere does NPPC point to any evidence "supporting the proposition that there is a 'substantial probability' of 'actual or imminent' injury to its members arising from" the Corps' failure to conduct an environmental analysis (*i.e.*, a PEIS) of permits it did not issue but should have. *Sierra Club*, 292 F.3d at 902 (quoting & citing *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000)). Tonsing's declaration offers plenty of speculation: Paragraph eight speaks of its members' "reduced" incentives in attempting to bring their projects within the parameters of the general permits, of the "very few" projects that "can" fit the new conditions, of the "virtual[] impossib[ility]" of meeting the conditions and of the "imagined environmental benefits" resulting from them. J.A. 128. But it offers nothing concrete from which we can conclude there is a "substantial probability" that NPPC's members will suffer an injury sufficient under *Sierra Club*. *See* 292 F.3d at 898. The declaration does not mention a single specific project or activity that will not be undertaken because of the more restrictive NWPs the Corps did issue—as opposed to some other, presumably more lenient, permits favored by NPPC's membership. *See* J.A. 125-29. Further casting doubt on the likelihood that, under its theory, NPPC will suffer any NEPA procedural harm is that, to the extent that NPPC members refuse to scale back their projects

and try to secure an individual permit instead, the environmental impact of any such project would be evaluated as part of the individual permitting process. *See* 33 C.F.R. § 325.2(a)(4) ("A decision on a permit application will require either an environmental assessment or an environmental impact statement unless it is included within a categorical exclusion."). Accordingly, because "a NEPA claim may not be raised by a party with no . . . apparent environmental interest," we are constrained to hold that the appellants cannot advance theirs. *Town of Stratford, Conn. v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002) (citation omitted). NEPA "cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant." *Id.*

Because we conclude that the appellants have not demonstrated a "substantial probability" that they fall within NEPA's zone of interest, we affirm the dismissal of this claim. In view of this holding, we do not reach the NEPA ripeness issue. *See N.J. Television Corp. v. FCC*, 393 F.3d 219, 221 (D.C. Cir. 2004) ("The priority for jurisdictional issues . . . doesn't control the sequence in which we resolve non-merits issues that prevent us from reaching the merits." (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999); *Grand Council of the Crees v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000))); *see also Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 463 (D.C. Cir. 1999) ("There is an array of nonmerits questions that we may decide in any order.").

## III.

For the foregoing reasons, the district court's grant of summary judgment to the Corps on the appellants' APA and RFA claims is reversed and remanded for further proceedings consistent with this opinion. The dismissal of the appellants' NEPA claim is affirmed.

*So ordered.*