# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 14, 2007          Decided July 17, 2007

No. 05-1177

ASSOCIATION OF IRRITATED RESIDENTS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
STEPHEN L. JOHNSON, ADMINISTRATOR, US ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

NATIONAL PORK PRODUCERS COUNCIL AND
ROE FARM, INC.,
INTERVENORS

———

Consolidated with
05-1336, 05-1337, 06-1053, 06-1209, 06-1320, 07-1038

———

On Petitions for Review of a Final Action of the
Environmental Protection Agency

———

Brent J. Newell argued the cause for petitioners. With him
on the briefs were *Patrick Gallagher* and *Angel M. Latterell.*
*David G. Bookbinder* entered an appearance.

*Norman L. Rave, Jr.*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Carol S. Holmes*, Counsel, Environmental Protection Agency.

*Richard E. Schwartz* and *Kirsten L. Nathanson* were on the brief for intervenors in support of respondents.

Before: SENTELLE, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Dissenting opinion filed by *Circuit Judge* ROGERS.

SENTELLE, *Circuit Judge*: Community and environmental groups petition for review of agreements between EPA and animal feeding operations. The agreements are designed to bring the facilities into compliance with the permitting and reporting requirements of three environmental statutes. Petitioners argue that the agreements are rules disguised as enforcement actions, that EPA did not follow proper procedures for rulemaking, and that EPA exceeded its statutory authority by entering into the agreements. We hold that the agreements do not constitute rules, but rather enforcement actions within EPA's statutory authority. We dismiss the petitions for review because exercises of EPA's enforcement discretion are not reviewable by this court.

**I.**

Animal feeding operations ("AFOs") are facilities where animals are raised for eggs, dairy, or slaughter. *See* 40 C.F.R. § 122.23(b)(1). At issue in this case are AFOs producing eggs, broiler chickens, turkeys, dairy, and swine. In the course of their operations, AFOs emit a number of pollutants regulated by

the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), and the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.* ("EPCRA") (collectively, the "Acts"). The pollutants – ammonia, hydrogen sulfide, particulate matter, and volatile organic compounds – emanate from animal housing structures and areas used to store and treat manure. *Animal Feeding Operations Consent Agreement and Final Order; Notice*, 70 Fed. Reg. 4958, 4959 (Jan. 31, 2005) ("*Consent Agreement*"). An AFO that releases these pollutants in sufficient quantities may be required to report them under CERCLA and EPCRA, and may be subject to various requirements under the Clean Air Act. *Id.* An AFO emitting these pollutants in quantities below the statutory thresholds, however, has no obligation under the Acts to obtain permits or report its emissions.

Petitioners are a number of community and environmental groups, some of whose members live near AFOs. They assert that the AFOs emit particulate pollution and terrible odors, and that they attract hordes of flies that leave their droppings on everything from cars to outdoor furniture. As a result, petitioners claim that their members suffer effects ranging from reduced enjoyment of the outdoor portion of their property to adverse health effects such as respiratory and heart problems. Additionally, as long as the AFOs' emissions are not definitively determined to be above or below the statutory thresholds, petitioners' members suffer from the uncertainty of not knowing whether the AFOs' emissions exceed legal limits, and not knowing how their long-term health may be affected.

Because the Acts apply only to emissions above specified levels, EPA cannot enforce the statutory and regulatory requirements without determining an AFO's emissions.

Generally, an AFO emits these pollutants in proportion to its size: the more animals it houses, the more it pollutes. Precise measurements have eluded the government and the AFO industry, which are in agreement that there is no existing methodology to measure reliably an AFO's emissions. AD HOC COMM. ON AIR EMISSIONS FROM ANIMAL FEEDING OPERATIONS ET AL., NAT'L RESEARCH COUNCIL, AIR EMISSIONS FROM ANIMAL FEEDING OPERATIONS: CURRENT KNOWLEDGE, FUTURE NEEDS (2003), *available at* http:www.nap.edu/catalog/10586.html; *Consent Agreement*, 70 Fed. Reg. at 4958. The present uncertainty hampers EPA's ability to enforce the requirements of the Clean Air Act, EPCRA, and CERCLA against AFOs. EPA's solution to this problem was to invite AFOs to sign a consent agreement under which each AFO will assist in developing an emissions estimating methodology. *Consent Agreement*, 70 Fed. Reg. at 4958. In exchange, EPA will not pursue administrative actions and lawsuits against the AFOs for a defined period of time. *Id.* at 4959. In the agency's judgment, this is the "quickest and most effective way" to achieve compliance. *Id.* at 4958.

EPA drafted the Consent Agreement in consultation with "representatives of state governments, environmental groups, local citizens' groups, and the AFO industry." *Id.* at 4961. On January 31, 2005, the agency published the final draft of the Agreement, invited interested AFOs to sign up, and sought public comment. *Id.* at 4958. After the comment period closed, EPA concluded that the "vast majority" of the comments received "were ones that had been previously expressed to EPA, and they had already been considered in the development of the Agreement." *Animal Feeding Operations Consent Agreement and Final Order*, 70 Fed. Reg. 40,016, 40,017 (July 12, 2005) ("*July 12 Notice*"). To date, several thousand AFOs have signed Agreements. Once EPA signs the Agreements, they are forwarded to EPA's Environmental Appeals Board ("EAB") for

approval. *See* 40 C.F.R. § 22.4(a)(1). The Agreements become enforceable against EPA once they are approved by the EAB in a final order. *See id.* §§ 22.18(b)(3), 22.4(a)(1). EAB has considered the Agreements in seven sets, and approved a total of 2,568 Agreements.

Although each participating AFO signs an individual Agreement with EPA, all the Agreements have identical terms. *Consent Agreement*, 70 Fed. Reg. at 4962-68. The AFO, although not admitting any violation of the Acts, agrees to pay a civil penalty for potential violations based on the size and number of its farms. *Id.* at 4965-66. It agrees to help fund a nationwide study that will monitor, over a two-year period, emissions from animal housing structures and manure storage and treatment areas. *Id.* at 4959, 4966-67. The AFO also agrees to permit its facility to be monitored in the study upon request. *Id.* at 4959-60, 4967. The study, designed in consultation with industry and academia, aims to generate "a valid sample that is representative of the vast majority of the participating AFOs" by monitoring different types of AFOs in different geographic areas. *Id.* at 4960. As data from the study is received, EPA will use it along with existing emissions data to develop scientifically sound tables or models for AFOs to estimate their emissions. *Id.* at 4960. In consideration for the AFOs' assistance, EPA agrees not to sue participating AFOs for certain potential past and ongoing violations of the Acts for the duration of the study. *Id.* at 4959, 4963-64. Within 120 days after EPA publishes the new methodologies, however, the AFO must initiate compliance efforts such as applying for a permit. *Id.* at 4964. EPA predicts that this schedule will result in compliance by participating AFOs within about four years from the start of the study. *Id.* at 4959-60.

Although the Agreement is intended to bring AFOs into eventual compliance with the Acts, petitioners argue that EPA

lacks authority to achieve compliance in this manner. They believe that the AFOs should be forced to comply more quickly with the statutory requirements. They also argue that the procedures by which EPA entered into the Agreement did not afford them the meaningful opportunity for comment required by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). Petitioners challenged the Agreement before the agency while it was being developed, and now identify ten agency actions that they contend should be vacated. Three are Federal Register notices: one announced the availability of the Agreement and solicited comments, *Consent Agreement*, 70 Fed. Reg. at 4958; another extended the period for sign-up and comment, *Animal Feeding Operations Consent Agreement and Final Order*, 70 Fed. Reg. 16,266 (Mar. 30, 2005); and the third published the agency's responses to the comments, *July 12 Notice*, 70 Fed. Reg. at 40,016. The seven remaining agency actions challenged by petitioners are the EAB final orders approving batches of the Agreements dated January 27, 2006, April 17, 2006, May 5, 2006, July 19, 2006, August 7, 2006, August 17, 2006, and August 21, 2006.

In EPA's view, the Agreement is not a rulemaking, but rather a valid exercise of the agency's enforcement discretion. EPA also argues that even if the Agreement constitutes a rulemaking, the agency did not violate the notice and comment requirements of the APA.

## II.

Our analysis of this case begins and ends with subject matter jurisdiction.[1] In this case, subject matter jurisdiction

---

[1]Although petitioners' standing was also challenged, this court is not bound to consider jurisdictional questions in any particular order. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85

turns on whether the Agreement constitutes a rulemaking subject to APA review, or an enforcement proceeding initiated at the agency's discretion and not reviewable by this court. Under the APA, this court may review final agency actions, including an agency's promulgation of a rule. 5 U.S.C. §§ 701-706. Excluded from this court's review, however, are agency actions that are "committed to agency discretion by law." *Id.* § 701(a)(2). Enforcement actions are generally within this exclusion, because "a court would have no meaningful standard against which to judge the agency's exercise of discretion" in deciding how to enforce the statutory provisions. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Petitioners advance a number of arguments in support of their contention that the Agreement is a rule. They contend that the Agreement meets the definition of "rule" under the APA and that it does not fall within the definition of an enforcement action. They also argue that the Agreement must be a rule because EPA has bound its enforcement discretion, a factor that this court previously found significant in determining whether an agency action is a rule. Finally, petitioners contend that even if the Agreement is an enforcement action, the agency exceeded its enforcement authority when it exempted AFOs from statutory requirements.

EPA's position that the Agreement is an exercise of enforcement discretion rather than a rule is based on case law explaining the substantive difference between the two. In the agency's view, the Agreement's purpose and effect are consistent with enforcement actions and inconsistent with rules. Moreover, EPA believes that the Agreement provides no exemption, but merely defers enforcement of certain statutory requirements in light of the agency's judgment that immediate

(1999).

compliance is impossible or impracticable. We hold that the Agreement represents an enforcement action not subject to our review.

**A.**

Under *Chaney*, "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion." 470 U.S. at 831. In that case, FDA rejected a citizen petition for the agency to take enforcement action against the use of drugs for lethal injection without approval for that use. Recognizing that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," the Supreme Court held that such decisions are presumptively unreviewable. *Id.* For example, "the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.*

Although the Supreme Court's decision in *Chaney* applies directly to agency decisions not to enforce a statute, we have also applied it to an agency's decision to settle an enforcement action. In *Schering Corporation v. Heckler*, we considered a settlement agreement between FDA and Tri-Bio, a drug manufacturer that marketed a drug without obtaining FDA approval. 779 F.2d 683 (D.C. Cir. 1985). The agreement terminated pending litigation in which the parties disputed whether Tri-Bio's product could bypass the approval process because it was identical to a competitor's product that was already on the market. *Id.* at 684-85. The parties agreed to dismiss the case, Tri-Bio agreed to pursue its claim before the

agency instead of in the courts, and FDA agreed not to pursue further enforcement actions for 18 months. *Id.* at 685. Schering – the competitor whose drug was already approved – sued, claiming that the agreement was invalid insofar as it granted a de facto approval of Tri-Bio's drug. *Id.* We affirmed the district court's ruling that FDA's decision to terminate the litigation with a settlement agreement was unreviewable under *Chaney*. *Id.* We held that FDA's agreement not to sue for 18 months "merely postponed any decision with regard to enforcement until it has had an opportunity to determine whether" the drug was subject to the Federal Food, Drug, and Cosmetic Act ("FDCA"). *Id.*

The present matter falls squarely within these precedents. As in *Schering*, EPA has doubts about AFOs' obligations under the Acts. *See id.* at 686-87 (holding that *Chaney* shields from judicial review the agency's decision to resolve its doubts about Tri-Bio's compliance with statutory requirements in an administrative rather than judicial forum). The Agreement is intended to save the time and cost of litigation while providing the agency with an opportunity to determine whether, and to what extent, AFOs are subject to the statutory requirements. *Consent Agreement*, 70 Fed. Reg. at 4958 (concluding that the Agreement "will help participating AFOs pool their resources to lower the cost of measuring emissions and ensure that they comply with all applicable environmental regulations in the shortest amount of time"). EPA could have pursued enforcement actions against each individual AFO, but determined that a broader strategy would lead to quicker industry-wide compliance. *Id.*; *July 12 Notice*, 70 Fed. Reg. at 40,018. These judgments – arising from considerations of resource allocation, agency priorities, and costs of alternatives – are well within the agency's expertise and discretion. *See Chaney*, 470 U.S. at 831-32.

*Chaney*'s presumption of non-reviewability only applies where the governing statute's enforcement provision describes the agency's role as discretionary. 470 U.S. at 835-37; *Schering*, 779 F.2d at 686 (describing *Chaney* as holding that "an agency judgment relating to the exercise of its enforcement power presumptively lies beyond the reach of APA review as an action 'committed to agency discretion by law'") (quoting 5 U.S.C. § 701(a)(2)). If, however, the governing statute removes the agency's discretion not to enforce, then there is "law to apply" under APA § 701(a)(2) and the *Chaney* presumption is rebutted. *Chaney*, 470 U.S. at 834-35. In *Chaney*, the FDCA's enforcement provision stated that "the Secretary is *authorized*" to take certain enforcement actions and that violators "shall be liable to be proceeded against." *Id.* at 835 (quoting 21 U.S.C. §§ 372, 334). The Supreme Court held that these provisions "commit[ted] complete discretion to the Secretary to decide how and when they should be exercised." *Id.*

In this case, the relevant statutes – the Clean Air Act, CERCLA and EPCRA – describe EPA's authority in similarly permissive terms. The Clean Air Act, for example, states in the primary federal enforcement provision that "whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this subchapter . . . the Administrator *may*" take any number of enforcement actions, including issuing an administrative penalty order, issuing a compliance order, bringing a civil action, or requesting that the Attorney General bring a criminal action. 42 U.S.C. § 7413(a)(3) (emphasis added). CERCLA's federal enforcement provision states in relevant part that the President "may" assess civil penalties, "may" bring a judicial action to assess and collect a penalty, and "may" grant rewards to facilitate prosecution of criminal violators. *Id.* § 9609(a)-(d). CERCLA provides that a class I or class II administrative

penalty "may be assessed by the President in the case of any of the following," and lists the CERCLA sections that are subject to each type of penalty. The President, therefore, is not bound to assess a given penalty for a given violation; rather, he merely has discretion to do so. The only limiting language appears in the subsection providing certain factors to determine the penalty amount, and limiting the dollar amount for each penalty; there is no limitation on the President's ability to refrain from issuing a penalty or take other enforcement measures. *Id.* § 9609(a)(1), (a)(3), (b)-(c). The President has delegated his powers under this CERCLA subsection to the Administrator of EPA, except where the violation falls within the jurisdiction of other executive departments, agencies, or the Coast Guard. Exec. Order No. 12,580, 52 Fed. Reg. 2923, 2925-27 (Jan. 23, 1987).

Finally, EPCRA's enforcement section provides that, for violations of the emergency planning and notification provisions, the Administrator "may" issue compliance orders, "may" assess administrative penalties, and "may" sue in court to assess and collect a penalty. 42 U.S.C. § 11045(a)-(c). The language limiting civil enforcement discretion only provides factors for arriving at a penalty amount. *Id.* § 11045(b)(1)(C). Violations of the reporting requirements are subject to a stricter standard, but it is not one that restricts EPA's discretion as to how to enforce the statute. "Any person . . . who violates" the reporting requirements "shall be liable to the United States for a civil penalty" in specified amounts, and each day such violations continue "shall . . . constitute a separate violation." *Id.* § 11045(c)(1)-(3). This language makes clear that the liability attaches immediately upon violation; but the statute goes on to state that "[t]he Administrator may assess any civil penalty for which a person is liable under this subsection by administrative order or may bring an action to assess and collect the penalty" in court. *Id.* § 11045(c)(4). The Administrator thus retains discretion to decide whether and how to pursue the

penalties that attach to violations.

None of the statutes' enforcement provisions give any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another. *See Chaney*, 470 U.S. at 835. Rather, the Acts are "framed in the permissive." *Id.* Decisions about whether and how to enforce the Acts against certain facilities are left to the discretion of the agency. *See Schering*, 779 F.2d at 687 (describing FDA's decision to settle as a product of "precisely the sort of balancing of agency priorities and objectives, informed by judgments based on agency expertise, that, absent some 'law to apply,' should not be second-guessed by a court"). And the statutes provide no meaningful guidelines defining the limits of that discretion. *See Chaney*, 470 U.S. at 834-35 (explaining that only when such standards are present may "courts . . . require that the agency follow that law"). Petitioners have pointed us to no statutory language that rebuts the *Chaney* presumption that the Agreement, as a civil enforcement decision, is committed to the discretion of the agency.

\* \* \*

We also reject petitioners' argument that the Agreement is a rule. The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Petitioners argue that the Agreement is intended to "prescribe law" because it grants an exemption from the Acts for a specified period of time. We disagree. The Agreement merely defers enforcement of the statutory requirements, and makes that deferral subject to enforcement conditions that will ultimately result in compliance. An AFO that fails to fulfill specific obligations loses the protections of the Agreement, leaving EPA free to sue or take other enforcement actions against the AFO.

A limited deferral subject to enforcement conditions works no change in the agency's substantive interpretation or implementation of the Acts. As a result, it is not consistent with the concept of a "rule" as that term has been defined.

In *National Association of Home Builders v. U.S. Army Corps of Engineers*, the Corps issued nationwide permits that authorized certain discharges into U.S. waters – something that could not otherwise be done under the governing statute without first obtaining an individual permit. 417 F.3d 1272 (D.C. Cir. 2005). This action effectively granted permittees the right to bypass certain requirements of the statute. *Id.* at 1279-80. In holding that the agency had in effect issued a rule, we described the nationwide permit as a "legal prescription . . . which the Corps has issued to implement" the permitting provisions of the applicable statute. *Id.* at 1284. In another case relied on by petitioners, *Croplife America v. EPA*, we held that EPA had promulgated a rule when it announced that the agency would no longer consider certain studies in its regulatory decisionmaking. 329 F.3d 876 (D.C. Cir. 2003). These studies had long been submitted by applicants – and accepted by EPA – as evidence of a pesticide's safety. *Id.* at 879-80. We rejected the agency's argument that the statement was merely one of policy because it was "a firm rule with legal consequences that are binding on both petitioners and the agency." *Id.* at 882. We also noted that petitioners would not have another opportunity to challenge the directive. *Id.*

Both *Home Builders* and *Croplife* address circumstances not present in the instant case. The AFOs' Agreement with EPA does not express the agency's implementation of any provision of the Clean Air Act, CERCLA or EPCRA. Rather, the Agreement implements a preliminary step – developing a reliable methodology – that the agency deems a prerequisite to enforcement of the Acts. The Agreement makes no

determination of an AFO's compliance with the Acts and makes no definitive statement of enforcement or interpretive practices that EPA will apply in its regulatory decisionmaking. *See Int'l Union v. Brock*, 783 F.2d 237, 245-46 (D.C. Cir. 1986) (distinguishing an agency's announcement of a new, substantive interpretation of the statute from those decisions that do not affect "underlying legal or factual issues"); *cf. Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (describing the EPA's interpretation of a statutory provision as having "to do with the substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* [*v. Chaney*] shields from judicial review").

More generally, in the Agreement EPA issues no statement with regard to substantive statutory standards. EPA has not bound itself in a way that reflects "cabining" of its prosecutorial discretion because it imposed no limit on its general enforcement discretion if the substantive statutory standards are violated. It is thus unlike *Community Nutrition Institute v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) (per curiam), a case in which we held that FDA's announcement of action levels that specified when merchants would be subject to enforcement proceedings under the statute constituted a rule. That was so because "cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule" when it "is in purpose or likely effect one that *narrowly limits administrative discretion*." *Id.* (internal quotation marks and citations omitted). In the instant case, EPA's "cabining" of its ability to sue AFOs for a period of time is not based on a substantive interpretation of the statutes, but rather is a way to defer enforcement of those substantive interpretations *until* EPA has determined how their requirements apply in the particular case of AFOs. *See Schering*, 779 F.2d at 686 (concluding that the agreement in that case was "a paradigm case of enforcement

discretion" because "the settlement agreement merely holds enforcement in abeyance until the agency can determine whether [the drug] is a product subject to the Act's requirements"). Moreover, to the extent EPA has limited its enforcement discretion, it has done so only with regard to those AFOs who have signed Agreements. Were *Community Nutrition Institute* to apply to the agency's decision to limit its enforcement discretion in individual cases, its reach would extend to nearly every consent agreement between an agency and a regulated entity. We do not read that case to have such broad effect.

\* \* \*

It is of little consequence that the procedural posture of this case differs from *Schering* and similar cases. In those cases, litigation was pending at the time of settlement, whereas here EPA has not filed complaints against the AFOs. Settlement without any court record is not uncommon in administrative law, because the agency may attempt negotiation before proceeding to court. If the parties succeed in negotiating a mutually agreeable resolution to the violations, the matter will not end up in court. The lack of a complaint does not render inapplicable *Chaney* and *Schering*. The law as stated in those cases shields from judicial review EPA's decision either to refrain from enforcement action or to settle pending litigation. Each decision implicates a number of factors bearing on the agency's enforcement authority, including policy priorities, allocation of resources, and likelihood of success – and it is the agency's evaluation of those factors that this court should not attempt to review. *See Chaney*, 470 U.S. at 831-32 ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."); *Schering*, 779 F.2d at 685-86 (discussing the Supreme Court's "clear signal [in *Chaney*] that such decisions by the FDA involve a complex balancing of an agency's priorities, informed by judgments

'peculiarly within its expertise,' and that they are therefore ill-suited for judicial review") (footnote omitted). The same factors are reflected in EPA's decision to settle potential litigation by industry-wide agreements instead of individual complaints. EPA has noted that requiring an AFO to monitor itself and attain compliance on a case-by-case basis is "difficult and time consuming," and thus EPA has concluded that the Agreement is the "quickest and most effective way" to achieve broad compliance. *Consent Agreement*, 70 Fed. Reg. at 4958; *July 12 Notice*, 70 Fed. Reg. at 40,018 (noting that EPA believes the approximately three and a half years needed to develop new methodologies "represents the most aggressive schedule that is reasonably possible"). We find no principled reason to treat EPA's decision to secure compliance by settlement in lieu of litigation differently than its decision to initiate and subsequently settle litigation. *Cf. N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1215 (D.C. Cir. 1993) ("We can see no reason for the FCC to have less latitude in the early stages of an enforcement action than after its completion."). As in *Schering*, "[w]e can no sooner question the soundness of th[e] bargain" to defer litigation in exchange for participation and funding of the study "than we could a unilateral agency decision not to prosecute *ab initio*." 779 F.2d at 687.

\* \* \*

We pause briefly to note that the questions left open by *Chaney* do not interfere with our conclusion today. *Chaney* excluded from its holding an agency's decision not to pursue a violation where the agency "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (internal quotation marks and citation omitted). Here, however, there is no indication that EPA has abandoned its responsibility to enforce the Acts. *Cf. Block v. SEC*, 50 F.3d 1078, 1084 (D.C.

Cir. 1995) (rejecting an argument that the SEC, by granting exemptions, had abdicated its responsibility to enforce another subsection of the Act, largely because the agency used the exemption application process to informally achieve compliance). The covenant not to sue participating AFOs does not represent a policy that EPA will not enforce the Acts; to the contrary, it is part of the agency's attempt to ensure that AFOs comply with the Acts. *See id.*; *see also Schering*, 779 F.2d at 687 (rejecting a description of the agreement not to prosecute for 18 months as a de facto determination of statutory requirements, and describing it as "simply represent[ing] the *quid pro quo* that the agency found necessary to procure Tri-Bio's abandonment of its declaratory judgment claim"). Nor is there any concern in this case that EPA has declined to enforce the Acts because it falsely believes that it lacks jurisdiction, the other possible exception to the rule of *Chaney*. *See Chaney*, 470 U.S. at 833 n.4; *see also id.* at 839 (Brennan, J., concurring).

**B.**

We also reject petitioners' argument that the Agreement exceeds EPA's authority under the Acts. As discussed *supra* Part II.A, the Acts' enforcement provisions grant EPA broad enforcement authority and discretion, authorizing the agency to choose among various methods to penalize violators and achieve compliance. *See* 42 U.S.C. §§ 7413(a)(3), 7414(a)(1)(D), 9609, 11045. For example, the Clean Air Act's primary enforcement provision provides, in relevant part:

> Except for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition . . . the Administrator may – (A) issue an administrative penalty

order in accordance with subsection (d) of this section, (B) issue an order requiring such person to comply with such requirement or prohibition, (C) bring a civil action in accordance with subsection (b) of this section or section 7605 of this title, or (D) request the Attorney General to commence a criminal action in accordance with subsection (c) of this section.

42 U.S.C. § 7413(a)(3). EPA's discretion in enforcing the Acts is apparent in the breadth of these enforcement options, as well as subsequent subsections that contain further grants of authority. For example, EPA may require a facility subject to the Clean Air Act to take actions to facilitate implementation of the Act or to determine whether the facility is in compliance. *Id.* § 7414(a). The agency may implement a field citation program to deal with minor violations, and may change a previously assessed penalty "with or without conditions." *Id.* § 7413(d)(3), (d)(2)(B). CERCLA provides that a class I or class II administrative penalty "may be assessed by the President in the case of any" violations listed in the statute. *Id.* § 9609(a)(1), (b). Alternatively, it authorizes the President to seek judicial assessment of a penalty. *Id.* § 9609(c). EPCRA's enforcement provision contains similarly broad language with regard to violations of the emergency planning and notification requirements:

> The Administrator may order a facility owner or operator . . . to comply with section 11002(c) of this title and section 11003(d) of this title. . . . A civil penalty . . . may be assessed by the Administrator in the case of a violation . . . . The Administrator may bring an action in the United States District Court for the appropriate district to assess and collect a penalty . . . .

*Id.* § 11045(a)-(b). We also note that EPA's regulations permit the agency to enforce the Acts by consent agreement and final order in lieu of filing a complaint. 40 C.F.R. § 22.13(b).

We read these enforcement provisions as broad grants of empowerment, not limitation. The authority bestowed on the agency sufficiently covers EPA's actions in this case. EPA's power to make decisions about whether and how to enforce the Acts reasonably contemplates the agency developing a plan for achieving compliance that it deems best suited to the industrial landscape and technological obstacles presented. Its ability to choose among numerous enforcement options in a particular case encompasses its decision that the best way to proceed in this case is by the Agreement.

## III.

The Agreements do not constitute rulemaking, but rather enforcement actions within EPA's statutory authority. EPA's exercises of its enforcement discretion are not reviewable by this court. The petitions for review are dismissed.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting: This case involves the intersection of two doctrines. The first involves an agency's unreviewable enforcement discretion, and the second relates to agency rulemaking power. The initial question for the court is whether the scope of enforcement discretion is expansive enough to cover the animal feeding operation ("AFO") protocol formally announced by the Environmental Protection Agency ("EPA") in the Federal Register on January 31, 2005, Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958, 4958, 4962-68 (Jan. 31, 2005) ("Initial Notice"). The court concludes that the enforcement protocol is an exercise of enforcement discretion that falls within the scope of the exception to judicial review set forth in *Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985), *see* Op. at 2, 8-9, and that EPA has not promulgated a legislative rule subject to the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, *see* Op. at 12-15. Undoubtedly there is some conceptual overlap between the doctrines to the extent that policies adopted by agencies often reflect discretionary determinations about how to enforce statutes that Congress has entrusted them to implement. However, by imposing a civil penalty on AFOs in the absence of individualized determinations of statutory violations, EPA has attempted to secure the benefits of legislative rulemaking without the burdens of its statutory duties. Our precedent does not permit the boundless stretching of *Chaney* to undercut the purposes of notice-and-comment rulemaking.

Additionally, even if *Chaney* creates a presumption of unreviewability of the enforcement protocol, *Chaney* further instructs that the presumption disappears when an agency veers far afield of Congress's enforcement regime. *See Chaney*, 470 U.S. at 832-33. By replacing the enforcement scheme in three congressional statutes with an unauthorized system of nominal taxation of regulated entities, EPA has promulgated a

reviewable regulation. EPA cannot avoid the regulatory responsibilities imposed by Congress by trading nominal sanctions for amnesty to the regulated industry. However much enforcement discretion EPA may have in determining whether or not to file enforcement actions and whether to settle and on what terms, Congress has not authorized EPA to allow the regulated community to buy its way out of compliance with the statutes. For a minimum penalty plus $2,500, an AFO can, under the enforcement protocol, avoid liability for any potential and ongoing violations of three statutes for at least a two-year period while EPA gathers and studies emissions data and for an indeterminate period thereafter while EPA develops and publishes new estimation methodologies, *see* Initial Notice, 70 Fed. Reg. at 4959, 4963-67; at no point are there repercussions beyond a possible future enforcement action if an AFO opts out of the agreement to be bound by the methodology regulations that EPA develops. Assuming no glitches, EPA's endeavor to develop reliable methodologies could, according to the recommendations it has followed, take five, twenty, or even thirty, years. This is not an enforcement scheme at all, and is not a decision that Congress committed to agency discretion. *See Chaney*, 470 U.S at 832-33 & n.4.

Accordingly, I respectfully dissent.

## I.

In announcing the new enforcement protocol, EPA advised AFOs in the egg, broiler chicken, turkey, dairy, and swine industries through the Initial Notice that they could avoid liability for "certain past and ongoing" violations of the Clean Air Act ("CAA"), the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), and the Emergency Planning and Community Right to Know Act ("Right to Know Act"). *See* Initial Notice, 70 Fed. Reg. at 4959.

All they had to do was agree to pay a minimal "civil penalty," calibrated by the number of "farms,"[1] plus (approximately) $2,500 per farm to fund the collection and study of nationwide emissions data over an (estimated) two-year period, and if selected, to allow EPA to monitor their operations' emissions during that period. *See id.* at 4959, 4963-67. Based on the collected data, EPA would develop emission estimation methodologies, loosely commencing approximately eighteen months after completion of the study. *See id.* at 4960. Publication of the new methodologies "will trigger the obligation of participating AFOs to determine their emissions" and to come into compliance with the CAA, CERCLA, and the Right to Know Act. *Id.* at 4959. AFOs signing the identical form agreements, appended to the Initial Notice, *see id.* at 4962-68, would receive from EPA "a limited release and covenant not to sue" until after the AFO uses the new estimation methodologies and reports its releases under CERCLA and the Right to Know Act and applies for and receives the requisite

---

[1] AFOs who sign up will have to pay:

> "[A] civil penalty which is based on the size of the AFO. The penalty ranges from $200 to $1,000 per AFO, depending upon the number of animals at the AFO. . . . The total penalty is capped and ranges from $10,000 for [a participant] having 10 or fewer farms to $100,000 for [a participant] having over 200 farms."

Initial Notice, 70 Fed. Reg. at 4959. According to the Industry Intervenors, in the absence of the enforcement protocol, "potential civil penalties could run up to $32,500 per day per violation." Brief of Intervenors for Respondents National Pork Producers Council and Roe Farm, Inc. at 6 (citing Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed. Reg. 7121, 7125-26 (Feb. 13, 2004)).

CAA permits.[2] *Id.* Any AFO would, however, be able to opt out of the agreement at any time without suffering any repercussions beyond the possibility of enforcement actions for past violations. *Id.* at 4959, 4963-67. The Initial Notice advised that the protocol would become effective only if a "sufficient" number of AFOs signed up. *Id.* at 4962. EPA requested public comment, "with particular emphasis on implementation," within thirty days, *id.* at 4961, subsequently reopening the comment period for thirty-three days, *see* Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 16266, 16266 (Mar. 30, 2005).

The Initial Notice has all the earmarks of a legislative rule subject to APA notice and comment requirements, 5 U.S.C. § 553. Because the proposed enforcement protocol is of "general . . . applicability," will have "future effect," and defines the rights and obligations of members of the regulated community, thereby constraining EPA's enforcement authority, it is a rule. *See id.* § 551(4); *Indus. Safety Equipment Ass'n. v. EPA*, 837 F.2d 1115, 1120 (D.C. Cir. 1988); *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980). EPA's enforcement protocol is not unlike the enforcement protocol in *CropLife America v. EPA*, 329 F.3d 876, 878 (D.C. Cir. 2003), where EPA

---

[2] Although the release of civil liability is described as a "limited release and covenant not to sue," Initial Notice, 70 Fed. Reg. at 4959, the form agreement, set forth in Appendix 1 of the Initial Notice, states that the release is complete for farms that an AFO lists in Attachment A to the form agreement, except for emergency situations due to accidental releases. *Id.* at 4963. Further, it is complete even as to violations that may be uncovered using the new methodologies: "The release and covenant not to sue found in paragraph 26 [of the form agreement] resolves only violations identified and quantified by applying the Emissions-Estimating Methodologies developed using data from the national air emissions monitoring study described herein." *Id.*

announced in the Federal Register that it would no longer consider human studies in its regulatory decisionmaking on the safety of pesticides under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, and the Federal Food, Drug and Cosmetic Act ("Food and Drug Act"), 21 U.S.C. § 301 *et seq.* The court held that the new enforcement policy was a legislative rule because "it create[d] a 'binding norm' that [wa]s 'finally determinative of the issues or rights to which it [wa]s addressed.'" *Croplife*, 329 F.3d at 881 (quoting *Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206, 212 (D.C. Cir. 1999)). The policy was binding not only on the individuals challenging the rule, but also "on the agency because EPA ha[d] made it clear that it simply 'will not consider' human studies." *Id.* Similarly here, EPA has announced a new general approach to carrying out its responsibilities under three statutes — provided a "sufficient" number of AFOs sign up and the Environmental Appeals Board ("EAB") approves the individual AFO form agreements. *See* Initial Notice, 70 Fed. Reg. at 4962, 4967. The new protocol is binding on both the AFOs who sign up and the agency, and under its terms, *see id.* at 4962, it will bind most of the regulated AFO industry.[3] Under the circumstances, EPA's new enforcement protocol is a legislative rule subject to notice and comment requirements under the APA.

---

[3] Unsurprisingly, given its virtual free pass for statutory violations, *see supra* notes 1, 2, approximately ninety-two percent (92%) of AFOs signed up. EPA informed the EAB that it had reports that there are 15,000 or more concentrated animal feeding operations nationwide and that the identical form agreements signed by AFOs "captured most or a lot of the largest farms." According to EPA's brief, "[a]pproximately 13,908 farms are covered under the[] agreements." Brief for Respondent EPA at 3 n.2. Before the EAB, EPA also acknowledged that, for the most part, industry trade associations, and not the individual AFOs who sign up, will actually pay the (approximately) $2,500 to fund the emissions study.

The court would avoid our precedent on legislative rules on two grounds. First, the court concludes that it lacks subject matter jurisdiction to consider Petitioners' challenges because EPA's decision to adopt the enforcement protocol is committed to its discretion by law and therefore falls within the scope of *Chaney*'s exception to judicial review, *see* 470 U.S. at 832-33. *See* Op. at 2, 8-9. However, EPA's decision is hardly the type of particularized discretionary enforcement determination that confronted the Supreme Court in *Chaney*. In *Chaney*, death row inmates challenged the refusal of the Food and Drug Administration ("FDA") to take various enforcement actions to prevent the use of lethal drugs for capital punishment. *Chaney*, 470 U.S. at 823. The inmates alleged that use of these drugs for executions violated the Food and Drug Act because the drugs had not been tested or approved for this purpose, they were likely to be administered by untrained personnel, and they were unlikely to induce quick and painless death as intended. *Id*. The Court held that the FDA's decision not to bring an enforcement action against particular members of the regulated community was "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2) and therefore judicially unreviewable. *Id.* at 832, 837-38. In announcing that such decisions were unsuitable for judicial review, the Court offered three rationales: (1) such decisions "involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," *id.* at 831; (2) "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect," *id.* at 832; and (3) "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict — a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed,'" *id.* (quoting U.S.

CONST., art. II, § 3).

The enforcement protocol set forth in the Initial Notice involves neither EPA's decision to bring or not to bring an enforcement action based on an investigation giving rise to a belief that a regulated party has failed to comply with statutory requirements, nor is it a decision by EPA to settle an enforcement action that it has brought against a particular entity or is prepared to file in view of evidence of a violation. Indeed, the Initial Notice expressly contrasts the enforcement protocol with the type of enforcement action discussed in *Chaney*. *See* Initial Notice, 70 Fed. Reg. at 4958. This court has applied *Chaney* to such traditional enforcement actions, based on the statutory scheme for enforcement, where an agency has made a particularized enforcement determination following an investigation of a regulated party's activities showing evidence of a statutory violation. For example, in *Baltimore Gas & Electric Co. v. Federal Energy Regulatory Commission*, 252 F.3d 456, 457, 460 (D.C. Cir. 2001), the court held it lacked jurisdiction over a challenge to the settlement of an enforcement action brought by FERC against two vendors of natural gas. Similarly, in *Schering Corp. v. Heckler*, 779 F.2d 683, 684-86 (D.C. Cir. 1985), the court held it lacked jurisdiction over a challenge seeking to invalidate the settlement of a lawsuit brought by a drug manufacturer against the FDA.

Although EPA could opt to forego bringing enforcement actions entirely, and its decision might be presumptively unreviewable, *see Chaney*, 470 U.S. at 832-33, that is not what happened here. Instead, EPA adopted a new generalized approach toward enforcing three environmental statutes in the future by means of an enforcement protocol unrelated to particularized findings of past or ongoing statutory violations and untethered to the enforcement regimes established by

Congress,[4] which EPA has previously utilized. Unlike the particularized actions which EPA has brought against AFOs in the past, *see* Initial Notice, 70 Fed. Reg. at 4958; Sanda S. Howland Aff. ¶¶ 8-11 (Jan. 5, 2006); Brief of Intervenors for Respondents National Pork Producers Council and Roe Farm, Inc. at 5 ("Industry Intervenors' Br."), the enforcement protocol neither tracks the statutory enforcement mechanisms of the three statutes nor purports to proceed on the basis of particularized information causing the agency to believe a statutory violation has occurred. Rather, EPA has used its coercive power to the extent that, upon entering into the identical form agreements, AFOs must commit, in return for a release from liability for any potential past or ongoing violations, to paying a civil penalty, to submitting to possible emissions monitoring, and to coming into compliance with new measurement methodologies or, upon opting out, to possible enforcement action, *see* Initial Notice, 70 Fed. Reg. at 4959. The statutory schemes for enforcement as previously interpreted by EPA have not included bringing its coercive power to bear absent some particularized factual basis for concluding the subject is in violation of the statutes.

Neither EPA's view that attaining compliance through case-by-case enforcement actions "is difficult and time consuming," *id.* at 4958; Op. at 16, nor the novelty of the enforcement protocol means that it is not a legislative rule. Although EPA styles the Initial Notice as involving a consent decree, it is a consent decree only in the sense that any regulated party has a choice whether or not to proceed in accordance with an agency rule; in *CropLife*, for example, if using human studies was important to a regulated party, it had a choice either to proceed or not under EPA rule's that it would not consider such studies. Further, contrary to the Industry Intervenors' view, the

---

[4] *See* 42 U.S.C. § 7413 (CAA); *id.* § 9609 (CERCLA); *id.* § 11045 (Right to Know Act).

enforcement protocol does not propose "informal adjudication[s]," Industry Intervenors' Br. at 17, because the AFOs who sign up admit to no liability (or even that the three statutes apply to their farms), *see* Initial Notice, 70 Fed. Reg. at 4962 (Appendix 1), and EPA has not determined the liability of any AFO, *see id.*, as would occur in an informal adjudication. *See Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1160-61 & n.17 (D.C. Cir. 1979).

Second, the court draws distinctions with our rulemaking precedent that begin with mischaracterizing the challenge before the court. The petition does not only challenge the individual form agreements between AFOs and EPA, *see* Op. at 2, but includes a challenge to the enforcement protocol in the Initial Notice on the grounds that EPA violated the APA's notice and comment requirements and exceeded its statutory authority, *see* Petitioners' Br. at 26-27, 44-53. From there the court invokes distinctions with our precedent that do not align with the terms of the protocol. The court states that the enforcement protocol is not a legislative rule because rather than "prescribing law," 5 U.S.C. § 551(4), the protocol "merely defers enforcement of the statutory requirements, and makes that deferral subject to enforcement conditions that will ultimately result in compliance." Op. at 12. In fact, the enforcement protocol forever absolves AFOs who sign up (and do not opt out) from liability for any potential past and ongoing violations. In the period of time that the court characterizes as a deferral, signing AFOs will face no prospect of liability through EPA enforcement actions for whatever they do or do not do to comply with the three statutes because EPA has committed not to exercise its enforcement authority. *See* Initial Notice, 70 Fed. Reg. at 4959, 4963. Any liability imposed by EPA for statutory violations will arise only sometime after EPA develops and publishes, and AFOs apply, new measurement methodologies, based on the two-year nationwide emissions study, and will

apply only to violations found at that time.  *See id.* at 4959.

Additionally, the court struggles to distinguish precedent such as *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279-80 (D.C. Cir. 2005), where the court held that the agency's authorization of a right to bypass certain statutory requirements constituted a rule.  *See* Op. at 13-14.  Under the enforcement protocol EPA has standardized minimum civil penalties based on farm size, bypassing those that would otherwise apply had EPA conducted site investigations as contemplated under the statutory enforcement schemes, *supra* notes 1, 4.  The court's attempt to distinguish *CropLife*, 329 F.3d at 881, likewise fails.  *See* Op. at 13-14.  It is unclear why the court views the enforcement protocol as any different from EPA's announcement that it would no longer consider human studies in enforcing FIFRA and the Food and Drug Act, *see Croplife*, 329 F.3d at 878-79.  So too here, EPA announced that for AFOs who sign up, it will no longer consider evidence of statutory violations by individual AFOs but instead will impose a farm-size minimum civil penalty, subject to a cap, and require a $2,500 payment in exchange for which AFOs will be absolved of liability for all past and ongoing statutory violations.  *See* Initial Notice, 70 Fed. Reg. at 4959.

The court concludes, notwithstanding EPA's stated intention to impose "a civil penalty" and to require a payment to fund a nationwide emissions study, that the identical form agreement for AFOs to sign "does not express the agency's implementation of any provision of the [three statutes]."  Op. at 13.  The court is correct in the sense that EPA has made "no determination of an AFO's compliance with the Acts," *id.*, after a particularized investigation of a regulated party's activities as contemplated under the enforcement regimes of the statutes, *supra* note 4, but it is incorrect to suggest that EPA has not made a "definitive statement of enforcement or interpretive practices,"

Op. at 14. Just as with its deferral characterization, the court ignores the reality of EPA's enforcement protocol, which absolves AFOs who sign up of liability for any potential past and ongoing violations.

The same flaw is evident in the court's statement that "EPA has not bound itself in a way that reflects 'cabining' of its prosecutorial discretion because it imposed no limit on its general enforcement discretion if the substantive standards are violated." Op. at 14. In fact, the enforcement protocol has done precisely that. In *Community Nutrition Institute v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987), the court explained that "cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule." Under the enforcement protocol EPA foregoes its enforcement discretion to file actions against signing AFOs, regardless of whether EPA may attain information during the life of the agreement that an AFO has violated or is violating one of the statutes; only the AFOs that do not sign the agreements — approximately eight percent of AFOs, *see supra* note 3 — "will be subject to enforcement actions in which significant penalties and injunctive relief could be sought for violations of the CAA, section 103 of CERCLA, and section 304 of [the Right to Know Act]." Initial Notice, 70 Fed. Reg. at 4961. Until EPA begins to publish the new methodologies for estimating emissions "on a rolling basis as work is completed," *id*. at 4960, following the nationwide two-year emissions study, EPA has released the signing AFOs from any liability prior to the time the AFO applies the new measurement methodologies and reports its releases under CERCLA and the Right to Know Act and applies for and receives the requisite CAA permits, *see id*. at 4959. Tellingly, the court concedes that "to the extent EPA has limited its enforcement discretion, it has done so only with regard to those AFOs who have signed Agreements," Op. at 15, but chooses to ignore that EPA conditioned its enforcement protocol

on a "sufficient" number of AFOs signing up, *see* Initial Notice, 70 Fed. Reg. at 4962, 4965, and that, given the terms of the enforcement protocol, the response to the sign-up invitation in the Initial Notice has been overwhelming, *see supra* note 3.

Finally, detaching *Chaney* from its moorings undercuts one of the key purposes of the APA. The legislative history of the APA states that "due to the unrepresentative nature of an administrative agency, 'public participation . . . in the rulemaking process is essential in order to permit administrative agencies to inform themselves and to afford safeguards to private interests.'"[5] *Batterton v. Marshall*, 648 F.2d 694, 704 n.47 (D.C. Cir. 1980) (quoting S. COMM. ON THE JUDICIARY,

---

[5] With regard to public access to agency records, the legislative history of the APA explains that:

> The public information requirements of section [5 U.S.C. § 552] are in many ways among the most important, far-reaching, and useful provisions of the bill. For the information and protection of the public wherever located, these provisions require agencies to take the mystery out of administrative procedure by stating it. The section has been drawn upon the theory that administrative operations and procedures are public property which the general public, rather than a few specialists or lobbyists, is entitled to know or to have the ready means of knowing with definiteness and assurance.

S. REP. NO. 79-752 (1945), *as reprinted in* LEGISLATIVE HISTORY OF THE ADMINISTRATIVE PROCEDURE ACT, S. DOC. NO. 248, 79th Cong., 2d Sess. 185, 198 (1946); *see also* H. REP. 79-1980 (1946), *as reprinted in* LEGISLATIVE HISTORY OF THE ADMINISTRATIVE PROCEDURE ACT, S. DOC. NO. 248, 79th Cong., 2d Sess. 233, 252, 256 (1946).

79th Cong., SENATE JUDICIARY COMMITTEE PRINT (1945), *as reprinted in* S. DOC. NO. 248, 79th Cong., 2d Sess. 11, 19-20 (1946)); *see Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).  The Supreme Court has observed that "[i]n enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979). "[P]ublic participation assures that the agency will have before it the facts and information relevant to a particular administrative problem . . . [and] increase[s] the likelihood of administrative responsiveness to the needs and concerns of those affected."  *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1061 (D.C. Cir. 1987) (omission in original) (alterations in original) (quoting *Guardian Fed. Sav. & Loan v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978)); *see Nat'l Welfare Rights Org. v. Mathews*, 533 F.2d 637, 648 n.17 (D.C. Cir. 1976).

EPA's new enforcement protocol will have significant and immediate negative consequences.  As EPA acknowledges, it affects both members of the regulated industry and those whom Congress intended to protect under the statutes as well as the safety and health of the environment. *See* Initial Notice, 70 Fed. Reg. at 4959.  Emissions from AFOs not only have negative impacts on nearby residents by causing odors and other nuisances, but they emit pollutants, including ammonia and hydrogen sulfide, which are classified as hazardous substances under CERCLA and the Right to Know Act, as well as particulate matter and volatile organic compounds, which, along with hydrogen sulfide, are regulated under the CAA.  *See id.* Ensuring accountability and informed decisionmaking means an agency needs to hear from those who are affected before it

adopts an enforcement policy that eliminates enforcement of several statutes for years for a significant part of the AFO industry, including "most or a lot of the largest farms," *supra* note 3, and perhaps for one hundred percent of the AFOs in light of EPA's view that its current methodology needs improvement, *see* Initial Notice, 70 Fed. Reg. at 4958. Congress determined in enacting the APA that closed door meetings and informal discussions in the absence of public notice of the agency's view of a final proposal are not sufficient to the task. *See Chrysler Corp.*, 441 U.S. at 316; *Batterton*, 648 F.2d at 704 n.47.

## II.

The presumption of unreviewability announced in *Chaney* may be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832-33. It also is possible that it may be rebutted where the agency refuses to act based solely on the belief it lacks jurisdiction or "the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc)).

Each of the three statutes at issue prescribes monetary and other penalties for violations, including criminal penalties in some instances, when EPA undertakes its enforcement responsibilities. *See supra* note 4. For example, under the CAA, upon finding a violation of a State Implementation Plan or permit, the EPA Administrator is required to notify the violator and the State and, after thirty days, may issue an order of compliance, impose an administrative penalty, or bring a civil action. 42 U.S.C. § 7413(a)(1). In other circumstances, the Administrator is required to give public notice, *id.* § 7413(a)(2), and for other violations the Administrator may issue compliance

orders, impose administrative penalties, bring a civil action, or request the Attorney General to commence a criminal action, *id.* § 7413(a)(3). Although Congress vested discretion in the Administrator over whether to bring civil enforcement actions, Congress expressly required that such actions be based upon a determination that the subject "has violated, or is in violation of, any requirement or prohibition of" a State plan or permit or certain statutory provisions. *Id.* §§ 7413(a)(1)(C), (a)(2)(C), (b)(1), (b)(2). Criminal penalties are likewise predicated upon findings of knowing violations. *Id.* § 7413(c). CERCLA similarly provides for civil and administrative penalties based on found violations. *Id.* §§ 9609(a)(1), (b), (c). Even the Right to Know Act includes criminal as well as civil penalties for found violations. *Id.* §§ 11045(b), (c). Notwithstanding this broad delegation of enforcement authority, however, Congress did not authorize EPA to tax members of the regulated industry, no matter what its motives. Instead, Congress authorized EPA to impose penalties based on particularized evidence of statutory violations. Further evidence that Congress intended EPA's imposition of penalties to be based on found violations is apparent from the authority it delegated to EPA, under section 114 of the CAA, for example, to require AFOs to monitor and report emissions from their facilities, *id.* § 7414(a).

The enforcement protocol takes an entirely different tack. Relying on a study by the National Academy of Sciences in 2003,[6] EPA has determined that its measurement methodologies

---

[6] NAT'L ACAD. OF SCI., AD HOC COMM. ON AIR EMISSIONS FROM ANIMAL FEEDING OPERATIONS ET AL., NAT'L RESEARCH COUNCIL, AIR EMISSIONS FROM ANIMAL FEEDING OPERATIONS: CURRENT KNOWLEDGE, FUTURE NEEDS (2003), *available at* http://www.nap.edu/catalog/10586.html ("NAS study on *AFO Air Emissions*"); *see also* Initial Notice, 70 Fed. Reg. at 4960 (citing NAT'L ACAD. OF SCI., THE SCIENTIFIC BASIS FOR ESTIMATING AIR

require updating and improvement. *See* Initial Notice, 70 Fed. Reg. at 4958. According to the study, emission estimating methodologies can be improved through research in the short term, i.e., five years, but research is merely the first step in developing the comprehensive process-based model that the study recommends, which may involve twenty to thirty years.[7] *See* NAS study on *AFO Air Emissions* at 11, 12, 16, 154-55. EPA has nonetheless estimated that it will begin publishing new methodologies within approximately three and a half years, *see* Initial Notice, 70 Fed. Reg. at 4960, assuming, contrary to the reality that Industry Intervenors suggest regarding monitoring methods, *see* Industry Intervenors' Br. at 4-5, that the two-year nationwide emissions study commences promptly upon EPA's determination of the appropriate monitoring methods and procedures.

---

EMISSIONS FROM ANIMAL FEEDING OPERATIONS, Interim Report, National Research Council (2002)).

[7] The National Academy of Sciences study concluded that "available estimates of emissions factors, rates, and concentrations are sufficiently uncertain that they provide a poor basis for regulating or managing air emissions from AFOs," NAS study on AFO Air Emissions at 6, and that "[s]cientifically sound and practical protocols for measuring air concentrations, emission rates, and fates are needed," *id.* at 8. The study identified short term (five years or less) and long term (twenty to thirty years) research priorities. Under the five year model, EPA would research concentration measurements, dispersion modeling, odor measurement and characterization, and abatement and management strategies. *Id.* at 154-61, 168. Under the twenty-plus year model, EPA would focus on researching an integrated program to reduce the losses of materials from AFOs to the environment by more efficient use of input materials and increased recycling of materials containing certain chemicals within the AFOs. *Id.* at 161-68.

In announcing the new enforcement protocol, EPA purports to respond to a problem of "uncertainty regarding emissions from AFOs" arising from lack of data involving large operations that would require a commitment of substantial resources and time to gather the data. Initial Notice, 70 Fed. Reg. at 4958; *see* Respondent's Br. at 21-22; Industry Intervenors' Br. at 1, 3-5. AFOs "have no 'smokestacks' from which air emissions can be measured." Industry Intervenors' Br. at 2. EPA states that it believes that the enforcement protocol, in comparison to filing individual enforcement actions, is "the quickest and most effective way to address the current uncertainty regarding emissions from AFOs and to bring all participating AFOs into compliance with all applicable regulatory requirements." Initial Notice, 70 Fed. Reg. at 4958 (citing NAS study on *AFO Air Emissions*). Although EPA plans to establish and begin to publish the new methodologies "on a rolling basis as work is completed," *id.* at 4960, within approximately eighteen months after completion of the (approximately) two-year nationwide monitoring study, how long it will actually take for EPA to begin monitoring emissions and then to establish the new methodologies is unclear; in the past, disputes regarding emission monitoring methods and procedures have caused delays, *see* Howland Decl. ¶¶ 6, 9. The recommendation of the National Academy of Sciences, which EPA claims to follow, *see* Initial Notice, 70 Fed. Reg. at 4960, calls for extensive air emissions testing over a wide variety of facilities and locations in order to have a more widely accepted standard for determining whether AFOs are in compliance with the statutes. *See* Howland Decl. at ¶ 6; NAS study on *AFO Air Emissions*, at 71-72, 152-68, 172-75.

Neither EPA's "uncertainty" nor the NAS study on *AFO Air Emissions* is dispositive of EPA's authority to proceed in the proposed manner. In the meantime, while EPA is gathering data and developing emission estimating methodologies, the National

Academy of Sciences did not suggest that EPA could do nothing by way of enforcement. The study's basic criticism was that EPA had too little data but this is not the same as concluding that relevant and sufficient data could not be collected, as Congress provided in section 114 of the CAA, 42 U.S.C. § 7414(a), for example, by requiring AFOs to monitor and report their emissions so that EPA could determine whether there is evidence of a statutory violation and if so, decide whether to bring enforcement actions. Assuming the scientific merit of the National Academy of Sciences' recommendations, the study does not demonstrate, notwithstanding the industry's objection to the high cost of self-monitoring, *see* Industry Intervenors' Br. at 3-4; Tr. of EAB Hearing at 43-44 (Dec. 13, 2005), that Congress's enforcement schemes were not designed to achieve the same results, namely enforcement based on reliable data on AFO emissions.

EPA concludes that by imposing "a civil penalty" and requiring a $2,500 study payment as the price for escaping liability for any potential past or ongoing statutory violations until EPA develops and publishes — and AFOs apply — the new methodologies, it is likely to bring the AFO industry into compliance with the statutes more quickly than would traditional, individual enforcement actions, which may involve extensive and difficult data collection efforts and lengthy enforcement actions. *See* Initial Notice, 70 Fed. Reg. at 4958; Howland Decl. at ¶¶ 8-13. Maybe so, although the forty-two month period EPA identifies is uncertain at both ends. Regardless, Congress has made a different choice about how to achieve statutory compliance and until Congress determines that evidence of violations is not the basis for imposition of penalties, EPA is bound to adhere to the enforcement regimes Congress has established, including directing the regulated community to monitor and report emissions data. EPA only has such authority as Congress has delegated to it: "As the Supreme

Court has recognized, 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n*, 372 F.3d 395, 398 (D.C. Cir. 2004) (omission in original) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).